No. 25-5503

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

GUARDANT HEALTH, INC.,

*Plaintiff-Appellee,*

*v.*

NATERA, INC.,

*Defendant-Appellant.*

On Appeal from the United States District Court
for the Northern District of California, No. 3:21-CV-04062 (Chen, J.)

**REDACTED**

**BRIEF FOR APPELLANT**

THOMAS G. SPRANKLING
WILMER CUTLER PICKERING
  HALE AND DORR LLP
2600 El Camino Real Suite 400
Palo Alto, CA 94306
(650) 858-6000

SETH P. WAXMAN
JOHN HE
WILMER CUTLER PICKERING
  HALE AND DORR LLP
2100 Pennsylvania Ave NW
Washington DC, 20037
(202) 663-6000

MICHAEL J. SUMMERSGILL
ADELA LILOLLARI
WILMER CUTLER PICKERING
  HALE AND DORR LLP
60 State Street
Boston, MA 02109
(617) 526-6000

December 18, 2025

# TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ...............................................................................iv

INTRODUCTION .............................................................................................1

JURISDICTION.................................................................................................3

ISSUES ON APPEAL ........................................................................................4

STATEMENT ....................................................................................................5

    A.    Natera Is Founded In 2004 To Provide Doctors And Their Patients With Detailed, Accurate Data Regarding Pregnancy, Organ Transplants, And Cancer ...........................................5

    B.    Natera Launches The First-Of-Its-Kind Signatera Test, Which Tests For Recurring Colorectal Cancer .....................................6

    C.    Guardant—The Previously Dominant Player In the Cancer Testing Industry—Launches Reveal And Interjects Itself In An Ongoing Peer-Reviewed Study..........................9

    D.    In Spring 2021, Natera Sets Out To Correct The False And Misleading Impressions Created By Guardant ..........................13

    E.    District Court Proceedings .................................................................16

        1.    Both Parties Allege False Advertising.......................................16

        2.    The Court Rules In Guardant's Favor On Summary Judgment And *Daubert* Issues .................................17

        3.    The Court Rules In Guardant's Favor On Jury Instructions Regarding The Test For Literal Falsity, The Availability Of Punitive Damages, And Liability For Statements Based on Peer-Reviewed Studies.......................................................................19

        4.    The Jury Awards Guardant Nearly $300 Million And Natera Nothing.................................................................20

- i -

SUMMARY OF THE ARGUMENT ..................................................................20

ARGUMENT ............................................................................................24

I. THE DISTRICT COURT ERRED BY INSTRUCTING THE JURY THAT
IT COULD FIND NATERA'S ADVERTISEMENTS "LITERALLY
FALSE" SIMPLY BECAUSE THE ADVERTISEMENTS PRESENTED AN
ALLEGED "APPLES-TO-ORANGES" COMPARISON ............................................24

    A. The District Court Erred By Instructing The Jury On The
"Apples-To-Oranges" Test....................................................................26

        1. The False-By-Necessary-Implication Doctrine Is A
Narrow Exception To The Rule That A Plaintiff
Must Show A Statement Was False On Its Face Or
Misled Consumers ...................................................................26

        2. The "Apples-To-Oranges" Instruction Permitted
The Jury To Find Literal Falsity Based On
Subjective Considerations Where An
Advertisement Did Not Convey Even A Single,
Unambiguously False Statement................................................29

    B. The Court's Error Was Not Harmless................................................34

    C. If This Court Orders A New Trial On Liability, The
Seventh Amendment Requires A New Trial On Damages
As Well ................................................................................................39

II. THE DISTRICT COURT ERRED BY HOLDING THAT THE SECOND
CIRCUIT'S "DEFERENTIAL" REVIEW OF ADVERTISEMENTS THAT
CONTAIN STATEMENTS MADE IN PEER-REVIEWED STUDIES
APPLIED TO NATERA'S (BUT ONLY NATERA'S) CLAIMS..............................40

    A. The *ONY* Decision Cannot Be Squared With This Court's
Precedent And—Regardless—Is Unduly Protective Of
*Advertisements* That Reference Peer-Reviewed Studies ...................40

    B. If This Court Does Adopt The *ONY* Rule, That Rule
Should Also Apply To Natera's Statements ......................................46

III.    THE DISTRICT COURT ERRED BY PERMITTING THE JURY TO AWARD AN INFLATED, NINE-FIGURE SUM FOR ADVERTISEMENTS THAT ACCURATELY REPORTED THE RESULTS OF PEER-REVIEWED STUDIES ...............................................47

    A.    The Court Erred By Allowing Guardant To Present An Unreliable Compensatory Damages Theory .......................................47

        1.    Malackowski's 3X Multiplier Was Based On An Unreliable Methodology ..............................................48

        2.    Admitting Malackowski's Opinions On The 3X Multiplier Was Prejudicial .........................................53

    B.    The District Court Erred By Permitting The Jury To Award $175.5 Million In Punitive Damages .......................................54

        1.    The Court Erred By Instructing The Jury That Punitive Damages Were Available ..........................................54

            a.    California Common Law Only Covers "Passing Off" Claims ...........................................54

            b.    The Instructional Error Was Not Harmless ....................57

        2.    No Reasonable Jury Could Have Found Guardant Proved Natera Engaged In The Kind of Despicable Conduct That Warrants Punitive Damages..............................58

        3.    The Jury Could Not Have Awarded More Than $75 Million In Punitive Damages Without Violating Due Process................................................60

CONCLUSION ................................................................................62

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

# TABLE OF AUTHORITIES

## CASES

Page(s)

*Ariix, LLC v. NutriSearch Corporation*, 985 F.3d 1107 (9th Cir. 2021)..................42

*Bank of the West v. Superior Court*, 833 P.2d 545 (Cal. 1992)...............................55

*Bell v. Wilmott Storage Services, LLC*, 12 F.4th 1065 (9th Cir. 2021) ...................42

*BladeRoom Group Ltd. v. Emerson Electric Company*, 20 F.4th 1231
    (9th Cir. 2021) .......................................................34, 35, 39, 45, 57

*Blumenthal Distributing, Inc. v. Herman Miller, Inc.*, 963 F.3d 859
    (9th Cir. 2020) ...........................................................................25

*Bolger v. Youngs Drug Products Corporation*, 463 U.S. 60 (1983) .......................43

*CareDx, Inc. v. Natera, Inc.*, 2021 WL 1840646 (D. Del. May 7,
    2021) .................................................................................49, 50

*Casey v. Albertson's Inc.*, 362 F.3d 1254 (9th Cir. 2004) .........................................4

*Castrol Inc. v. Pennzoil Company*, 987 F.2d 939 (3d Cir. 1993) ...........................30

*Chuman v. Wright*, 76 F.3d 292 (9th Cir. 1996)...............................................30, 31

*Cleary v. News Corporation*, 30 F.3d 1255 (9th Cir. 1994)...................................56

*Clorox Company Puerto Rico v. Proctor & Gamble Commercial
    Company*, 228 F.3d 24 (1st Cir. 2000) .............................................27, 28, 30

*Clorox Company v. Reckitt Benckiser Group PLC*,
    398 F. Supp. 3d 623 (N.D. Cal. 2019)...............................................18, 32, 33

*Conformis, Inc. v. Aetna, Inc.*, 58 F.4th 517 (1st Cir. 2023) ..................................43

*Cook, Perkiss & Liehe, Inc. v. Northern California Collection Service
    Inc.*, 911 F.2d 242 (9th Cir. 1990)................................................................35

*Design Resources, Inc. v. Leather Industries of America*, 789 F.3d 495
    (4th Cir. 2015) .....................................................................30, 33

*Duncan v. Stuetzle*, 76 F.3d 1480 (9th Cir. 1996) .................................................54

*Eastman Chemical Company v. Plastipure, Inc.*, 775 F.3d 230
(5th Cir. 2014) ......................................................................26, 43

*Eli Lilly & Company v. Arla Foods, Inc.*, 893 F.3d 375 (7th Cir. 2018).................27

*Engilis v. Monsanto Company*, 151 F.4th 1040 (9th Cir. 2025).........................48, 52

*Estate of Barabin v. AstenJohnson, Inc.*, 740 F.3d 457 (9th Cir. 2014)............52, 53

*Gasoline Products Company v. Champlin Refining Company*,
283 U.S. 494 (1931)....................................................................39

*Groupe SEB USA, Inc. v. Euro-Pro Operating LLC*, 774 F.3d 192
(3d Cir. 2014)..............................................................................27

*Hardeman v. Monsanto Company*, 997 F.3d 941 (9th Cir. 2021) ...........58, 60, 61, 62

*Innovation Ventures, LLC v. N.V.E., Inc.*, 694 F.3d 723
(6th Cir. 2012) ............................................................................27

*Leatherman Tool Group, Inc. v. Cooper Industries, Inc.*,
285 F.3d 1146 (9th Cir. 2002) .........................................................62

*Los Defensores, Inc. v. Gomez*, 223 Cal.App.4th 377 (2014) .................................55

*Marroquin v. City of Los Angeles*, 112 F.4th 1204 (9th Cir. 2024) .......................39

*Munson v. Del Taco, Inc.*, 522 F.3d 997 (9th Cir. 2008).......................................56

*ONY, Inc. v. Cornerstone Therapeutics, Inc.*, 720 F.3d 490
(2d Cir. 2013)..............................................................18, 41, 42, 46, 47

*Partington v. Bugliosi*, 56 F.3d 1147 (9th Cir. 1995).............................................28

*Prime Finish, LLC v. ITW Deltar IPAC*, 766 F. App'x 183
(6th Cir. 2019) ............................................................................57

*Rearden, LLC v. Walt Disney Pictures*, 152 F.4th 1058 (9th Cir. 2025).................48

*Riley v. Volkswagen Group of America, Inc.*, 51 F.4th 896
(9th Cir. 2022) ............................................................................62

*Schrader Cellars, LLC v. Roach*, 129 F.4th 1115 (9th Cir. 2025) .........................44

*Scotts Company v. United Industrial Corporation*, 315 F.3d 264
(4th Cir. 2002) ......................................................................28

*Simon v. San Paolo U.S. Holding Company*, 113 P.3d 63 (Cal. 2005) ...................58

*Southland Sod Farms v. Stover Seed Company*, 108 F.3d 1134
(9th Cir. 1997) ...................................................24, 26, 27, 40, 55

*State Farm Mutual Automobile Insurance Company v. Campbell*,
538 U.S. 408 (2003)............................................................60, 61, 62

*Sybersound Records, Inc. v. UAV Corporation*, 517 F.3d 1137
(9th Cir. 2008) ......................................................................55

*Time Warner Cable, Inc. v. DIRECTV, Inc.*, 497 F.3d 144
(2d Cir. 2007)....................................................................27, 28

*U.S. Fidelity & Guaranty Company v. Lee Investments, LLC*,
641 F.3d 1126 (9th Cir. 2011) ......................................................56

*Uniloc USA, Inc. v. Microsoft Corporation*, 632 F.3d 1292
(Fed. Cir. 2011)................................................................49, 50

*United States v. Bacon*, 979 F.3d 766 (9th Cir. 2020)......................................53, 54

*United States v. Ingham*, 486 F.3d 1068 (9th Cir. 2007)........................................57

*United States v. Liu*, 731 F.3d 982 (9th Cir. 2013).................................................38

*Zoller Laboratories, LLC v. NBTY, Inc.*, 111 F. App'x 978
(10th Cir. 2004) ......................................................................27

## DOCKETED CASES

*Natera, Inc. v. Guardant Health Inc.*, No. 6:21-cv-00540 (W.D. Tex.)..................17

## STATUTES AND RULES

15 U.S.C.
§ 1117 ......................................................................54
§ 1125 ......................................................................24

28 U.S.C.
    § 1291 ......................................................................................................4
    § 1331 ......................................................................................................3
    § 1367 ......................................................................................................3

Cal. Civ. Code § 3294 ...................................................................................58

Fed. R. Evid. 702 .............................................................4, 23, 48, 50, 51

## OTHER AUTHORITIES

Ammer, Christine, *The American Heritage Dictionary of Idioms*
    (2d ed. 2013) ......................................................................................31

Barone, James, *Comparing Apples and Oranges: A Randomized
    Prospective Study*, 321 British Med. J. 1569 (2000).....................32

4 McCarthy, Thomas, J., *McCarthy on Trademarks and Unfair
    Competition* § 27:54.50 (5th ed. 2025).........................................26

*Recent Case: First Amendment—False Advertising—Second Circuit
    Affirms that Dissemination of Scientific Publications Cannot Be
    False Advertising Under the Lanham Act—ONY, Inc. v.
    Cornerstone Therapeutics, Inc., 720 F.3d 490 (2d Cir. 2013),*
    127 Harv. L. Rev. 1815 (2014)..............................................43, 44

Roesler, Shannon M., *Evaluating Corporate Speech About Science*,
    106 Geo. L.J. 447 (2018).................................................................44

## INTRODUCTION

Appellant Natera, Inc. is a research and development company whose medical tests have revolutionized pre-natal diagnostics and cancer detection. One of Natera's flagship products is Signatera, a first-of-its-kind test that can identify the recurrence of cancer based on a single molecule of DNA. Threatened by Natera's success with Signatera, Appellee Guardant Health, Inc. sought to "fast-follow" Natera when seeking Medicare coverage for its rival Reveal test. As part of that process, Guardant insinuated itself in an ongoing study of Reveal's effectiveness—leading to a study that made false and misleading statements Guardant then repeated in its advertising.

To counter Guardant's false and misleading statements regarding the effectiveness of its Reveal test, Natera sent out several sets of documents to the medical community that accurately reproduced data for the two tests taken from two published peer-reviewed studies (including Guardant's study). Yet the jury in this false advertising case awarded Guardant nearly $300 million—an award Guardant's attorneys trumpeted as "one of the largest Lanham Act false advertising verdicts in history."[1] And the jury awarded Natera nothing on its claims predicated on Guardant's false and misleading advertisements.

---

[1] *See* https://kelleranderle.com/kas-team-wins-292-5-million-in-jury-trial-of-guardant-health-v-natera/ (visited Dec. 18, 2025).

How did this happen?  In short, the district court made multiple legal errors that infected every aspect of the jury's verdict.

*First*, as to Guardant's claims, the court instructed the jury that Guardant could prevail even if it did not prove Natera's advertisements were literally false on their face or misleading—so long as the jury found the advertisements made an "apples-to-oranges" comparison.  This exception has no basis in this Court's caselaw, would dramatically expand the scope of the Lanham Act at the expense of free speech, and would inhibit comparative advertising that can benefit consumers.

*Second*, as to Natera's counterclaims, the court imposed a heightened burden on Natera with respect to its claims regarding Guardant's advertising based on a study Guardant co-authored.  Specifically, the court held Guardant was immune from liability for advertisements that reported the (unreliable) results of the study unless Natera proved that the study was fraudulent or based on fabricated data.  This instruction was not based on any Ninth Circuit caselaw.  Rather, it drew from the Second Circuit's articulation of a First Amendment exception to the Lanham Act that this Court has never adopted and—even then—applied that burden only to Natera's claims and not Guardant's.

*Finally*, as to damages, the court abdicated its *Daubert* gatekeeping responsibility by allowing Guardant's expert to testify to a fundamentally unreliable methodology for compensatory damages—*i.e.*, that the jury could award

- 2 -

Guardant three times the amount Natera spent on advertising in response to Guardant. The court also permitted the jury to award $175.5 million in punitive damages—which are undisputedly unavailable under the Lanham Act—based on a reading of California common law inconsistent with both this Court's and the California Supreme Court's precedent.

Because the court's errors impacted every part of the case, Natera respectfully submits this Court should, at minimum, hold that punitive damages were unavailable (either categorically or based on the trial record) and reverse and remand for a new trial on all other issues. Only a new trial—in which the jury is accurately instructed on the law and hears only credible expert testimony—will give Natera a fair shot to explain both why its indisputably accurate advertisements were permissible and why Guardant's advertisements resting on a manipulated scientific study were not.

## JURISDICTION

The district court had jurisdiction under 28 U.S.C. § 1331 for the Lanham Act claims and under 28 U.S.C. § 1367 for the state law claims. The court entered an order on July 28, 2025, which instructed the clerk to issue a final judgment. 1-ER-55. While the clerk has not yet complied with that order, Natera timely filed a notice of appeal on August 26, 2025, 11-ER-2838-2843, and there is no dispute that a final judgment should issue, *see* D.Ct.Dkt. 1001 at 1 (Guardant's September

- 3 -

26, 2025 request for final judgment); *Casey v. Albertson's Inc.*, 362 F.3d 1254, 1258-1259 (9th Cir. 2004) (entry of a "separate document" for "final judgment" is not a "prerequisite to appeal"). This Court has jurisdiction under 28 U.S.C. § 1291.[2]

## ISSUES ON APPEAL

1.      Whether the district court erred by instructing the jury that an advertisement that accurately reports data from two sources violates the Lanham Act if it makes an "apples-to-oranges" comparison, regardless of whether the information in the advertisement is literally false on its face or could have misled a consumer.

2.      Whether the district court erred by (a) holding at summary judgment—and instructing the jury—that advertisements that accurately report results from a peer-reviewed study are *per se* non-actionable under the Lanham Act and (b) applying that rule only against Natera.

3.      Whether the district court erred under *Daubert* and FRE 702 by permitting Guardant's damages expert to testify that Guardant's compensatory damages could be calculated by trebling what Natera spent on responsive advertising.

---

[2] The final judgment has apparently been delayed by the adjudication of a sanctions issue involving Natera's trial counsel. The sanctions have no connection to the issues raised in this appeal.

4. Whether the district court erred by (a) instructing the jury it could award punitive damages against Natera based on a finding of liability under the Lanham Act, which undisputedly does not authorize punitive damages, (b) concluding that a jury could have found Natera engaged in the kind of despicable conduct necessary to justify punitive damages under California law, and (c) permitting the jury to award a higher sum of punitive damages than the Due Process Clause allows.

## STATEMENT

**A. Natera Is Founded In 2004 To Provide Doctors And Their Patients With Detailed, Accurate Data Regarding Pregnancy, Organ Transplants, And Cancer**

Natera was founded in 2004, one year after its co-founder's sister gave birth to a child with a fatal genetic condition that was not identified until the baby was born. 7-ER-1599-1600. Since then, Natera's central focus has been improving the quality and quantity of clinical data that is available to doctors, in the areas of women's health, organ health, and oncology. 7-ER-1600-1601.

Natera's unique approach is to "combine advanced methods of molecular biology with advanced techniques of signal processing." 7-ER-1602. Specifically, Natera built algorithms capable of detecting fragments of DNA that are released by cells in a person's bloodstream—called "cell-free DNA" or "cfDNA." 7-ER-1604; 8-ER-1901. By tracking cell-free DNA, Natera's tests can identify, for example,

the unique DNA of a fetus, a cancerous tumor, or an organ transplant failure far earlier than it otherwise could be detected.  7-ER-1604-1606.

### B. Natera Launches The First-Of-Its-Kind Signatera Test, Which Tests For Recurring Colorectal Cancer

The Natera technology at issue in this case is called Signatera.  Signatera is a test for the recurrence of cancer, including colorectal cancer—the second-leading cause of cancer deaths in the United States.  3-ER-484; 7-ER-1615.  Until recently, the only ways for doctors to screen patients for a recurrence of colorectal cancer were a colonoscopy (an invasive procedure in which a scope is used to check for polyps in the colon) or a CT scan (which can miss signs of cancer in the absence of a visible tumor).  3-ER-485, 488-489.  Among Signatera's many uses is that it can detect trace amounts of cancer (called circulating tumor DNA or ctDNA) remaining in a patient's body after a cancerous tumor has been removed—a phenomenon known as minimal (or molecular) residual disease ("MRD").  3-ER-485; 7-ER-1615-1616; 4-ER-918.  Signatera is so accurate that it can detect cancer recurrence based on a single molecule of DNA—equivalent to "finding one blade of grass in 100,000 football fields."  7-ER-1608.

Signatera uses information gleaned from a sample of the tumor tissue preserved from, for example, a patient's biopsy to create a bespoke blood test that can later detect the presence of cell-free DNA from the tumor in the patient's bloodstream—identifying both whether the DNA exists and whether the amount of

such DNA is increasing or decreasing. 7-ER-1614-1616, 1687-1688. In industry terms, this kind of test is called "tumor informed" because it is customized to a patient's previously collected tumor sample. 13-ER-3041 (MSJ order); 7-ER-1688.

While Natera had the capability to develop tests that do not rely on a tumor sample, it determined that the personalized tumor-informed approach was preferable. 7-ER-1615. Using a patient's own tumor sample means Signatera has "very high sensitivity" (*i.e.*, it accurately identifies when cancer is present, avoiding false negatives) and "very high specificity" (*i.e.*, it accurately identifies when cancer is not present, avoiding false positives). 7-ER-1615. It is undisputed that the vast majority of colorectal cancer patients have sufficient tumor tissue to use Signatera. *Compare, e.g.*, 7-ER-1760 (Natera witness testifying the number is 90% or more), *with* 3-ER-490 (Guardant witness testifying the number is 70% or more).

Shortly before Signatera was commercially launched in 2019, the journal *JAMA Oncology* published a peer-reviewed article by Dr. Thomas Reinert and several others that assessed Signatera's efficacy. 10-ER-2561 (TX-4); 4-ER-857.[3] The Reinert Study—which tested both for cancer recurrence in the early window

---

[3] Signatera was released for "research-use-only" in 2017. 13-ER-3040-3041.

after surgery/therapy (*i.e.,* in the "landmark" setting) and on a rolling basis roughly every three months after (in the "surveillance" setting)—concluded that the test could reliably anticipate colorectal cancer recurrence. 10-ER-2570-2571 (TX-4); *see also* 5-ER-1171-1172. Specifically, it concluded that Signatera had 88-94% serial longitudinal sensitivity, with a failure rate (meaning the inability to provide any test result) of less than 3%. 13-ER-3050, 3053-3054 (MSJ order). In reaching that conclusion, the study analyzed over 800 samples from 130 patients over a roughly three-year period. 10-ER-2561, 2563 (TX-4). As of trial, at least 85 peer-reviewed studies had been published about Signatera's efficacy. 7-ER-1618.

Signatera received an FDA "Breakthrough Device Designation," which provides for "expedited regulatory approval" of medical advances with "very high clinical utility." 6-ER-1296. Signatera was also approved for Medicare coverage. 7-ER-1690; 11-ER-2819-2822 (TX-841). Receiving Medicare coverage is an important step for any test, as it is seen by physicians and insurance companies as a "stamp of approval," increasing the likelihood a test will "get traction." 5-ER-956.

As of trial, Signatera was used by "more than 40 percent of oncologists." 6-ER-1297; *see also* 7-ER-1622. Although Signatera "sells for more than what the cost is to make the test," Natera presented evidence that Signatera does not yet make a profit because Natera continues to reinvest gross revenues in research and

development to "help patients," "improve tests," "launch new tests," and "get coverage in additional tumor types." 6-ER-1297-1298.

C. **Guardant—The Previously Dominant Player In the Cancer Testing Industry—Launches Reveal And Interjects Itself In An Ongoing Peer-Reviewed Study**

Prior to Signatera's introduction, Guardant "was the 800-pound gorilla" in the cancer testing space. 7-ER-1622; *see also* 7-ER-1702. Guardant sells Reveal, a test that purports to identify colorectal cancer MRD. 6-ER-1298-1299. Reveal is a "tumor naïve" test. 6-ER-1299; 7-ER-1614. This means that Reveal is not customized to a patient's tumor like Signatera but instead detects MRD by looking for common mutations associated with colorectal cancer in a patient's blood sample. 7-ER-1760; 8-ER-1894-1895.

After Natera received a favorable draft decision approving its request for Medicare coverage of Signatera in August 2019, Guardant made a strategic decision to "fast-follow" Signatera by using the "path to coverage" charted by Natera. 11-ER-2826 (TX-1369); *see* 5-ER-1169 (Guardant witness agreeing "there was a shift in strategy for how Guardant was going to commercialize Reveal"). That is because, to obtain Medicare coverage, Guardant needed to show that it had "equivalent or better performance to a test that's already covered." 7-ER-1786. Guardant's Senior Director of Medical Affairs explained in an email that this new "[f]ast follow-on" strategy would require "mapping" on to the draft coverage

decision, including reviewing the "Reinert" Study. 11-ER-2824 (TX-1369). Guardant, however, had a notable "[g]ap" in its data regarding Reveal's performance—it lacked information regarding how the test performed when used on a single patient over a prolonged time period. 11-ER-2824 (TX-1369); *see also* 5-ER-1171-1172. To use the technical terms, Guardant had access to data from the "landmark" setting, but not the "surveillance" setting. *See supra* p. 8 (explaining difference between landmark and surveillance contexts); *see also* 5-ER-1170-1171.

To fill the "[g]ap," Guardant sought to expand the scope of an existing study overseen by Dr. Aparna Parikh. 5-ER-1109, 1171. But because the Parikh Study had been focused on testing in the landmark context, 5-ER-1171, Guardant had to re-use and re-package existing data to create what it called "surveillance" analysis, *see* 10-ER-2412-2413 (Parikh Study co-author, Ryan Corcoran, testifying that the "surveillance" analysis was proposed by Guardant and required "a very specific definition of surveillance" that had never been used before); 11-ER-2279 (TX-641) (Guardant co-CEO stating in email that Guardant was seeking a "reanalysis [of data in order] to be similar to" the Reinert Study). This analysis falsely purported to include only patients who had "at least one more" blood draw or sample after the landmark blood draw (*i.e.*, a total of at least *two* blood draws), 5-ER-1108; in fact, several patients included in that study provided only a *single* blood draw, 8-ER-1962. In the course of re-using those previously gathered samples, Guardant

- 10 -

received clinical information about the patients who had provided the samples, even though the study purported to be blinded to such clinical information. 7-ER-1841-1842; 8-ER-2043, 2049; 10-ER-2553 (TX-1). And it was Guardant that ultimately performed the study's cell-free DNA analysis to report results. *See* 5-ER-990 (Guardant's co-CEO testifying that "[w]e were running the samples, of course we were involved [in the Parikh Study]."); 3-ER-583 (Guardant Vice President testifying that Guardant was involved in Parikh Study "[i]n the sample testing and analysis").

In April 2021, the journal *Clinical Cancer Research* published the final peer-reviewed paper by Dr. Parikh and a number of others—including Guardant's co-CEO, its Vice President of Medical Affairs, and three other employees—which concealed the shortcomings in the surveillance analysis discussed above. 10-ER-2551, 2553 (TX-1); 3-ER-583, 5-ER-1182. For example, despite the fact that some individuals analyzing the underlying samples knew whether the patients had recurring cancer, the Parikh Study (falsely) described itself as "blinded." 10-ER-2553 (TX-1). And despite the fact that the testing was based on retrospectively analyzing samples that had already been collected for another purpose, the study (again falsely) described itself as "prospective." 10-ER-2552 (TX-1). The Parikh Study also artificially inflated Reveal's clinical performance by imposing arbitrary cut-offs on what data was included and excluded. 13-ER-3101 (Natera's MSJ

opposition); *see, e.g.*, 13-ER-3105, 3119 (Natera's MSJ opposition exhibits O, III). For example, there was evidence that the Parikh Study imposed a one-year cut-off, when doing so excluded ███████████████████ a tactic that allowed the Parikh Study to misleadingly report Reveal has 100% specificity. 13-ER-3101 (collecting evidence).

The authors of the Parikh Study made their data public before publication, presenting their findings at various academic and industry conferences between 2019 and 2020. 5-ER-978-979. Guardant presented its data at the European Society of Medical Oncology ("ESMO") in October 2020, among others. 4-ER-858. The ESMO presentation reported "landmark sensitivity [as] 56 percent" and "longitudinal sensitivity [as] 69 percent." 4-ER-861; *see also* 11-ER-2777 (TX-619).

When compared to the ESMO numbers, Signatera had better performance metrics than Reveal. 4-ER-862, 880 (Masukawa). Yet, around the same time as ESMO, Guardant's co-CEO stated during an earnings call that he was "confident from recent data" that Reveal's "recurrence monitoring is ***best-in-class***." 5-ER-996.[4] Then, in January 2021, Guardant representatives appeared at the JPMorgan Healthcare Conference and stated—based on the Parikh Study results—that Reveal

---

[4] Emphasis added and internal quotation marks omitted unless noted.

had "industry-leading performance." 11-ER-2690 (TX-94). Guardant's presentation also stated that Reveal had 91% sensitivity and 100% specificity with a citation to the 2020 ESMO presentation, *id.*—despite that presentation reporting much lower sensitivity.

These numbers concerned Natera because they "had not seen the 91 percent in the ESMO poster." 4-ER-866. The JPMorgan presentation also introduced the purported surveillance analysis discussed above, which had not appeared in earlier presentations. 5-ER-1163.

## D. In Spring 2021, Natera Sets Out To Correct The False And Misleading Impressions Created By Guardant

Following Guardant's JPMorgan presentation, Natera developed an internal program (nicknamed "Project SOLAR") to combat Guardant's false and misleading statements regarding Reveal's supposed efficacy. 7-ER-1703-1704. As a first step, Natera set out to "figure out what these [Reveal] numbers were" and "where was this new information, these new claims coming from." 7-ER-1706. Specifically, one of Natera's employees with a medical background reached out to the lead authors of the Parikh Study to better understand the Study's numbers. *E.g.*, 7-ER-1706-1711; *see also* 11-ER-2719-2721 (TX-238); 11-ER-2722-2725 (TX-239) (email chains). The goal of these communications was to "understand what … the analysis was behind the claims that were being made publicly" since—at that point—the Parikh Study had not been published. 7-ER-

- 13 -

1711. Once the Parikh Study was published, Natera followed up with "additional correspondence … to point out some of the flaws that we saw in the study." 7-ER-1711.

"[O]nce [Natera] figured … out" the purported basis for Guardant's claims about Reveal, Natera came "up with a way to address [Guardant's] misleading claims in the marketplace." 7-ER-1706. In Spring 2021, for example, Natera emailed oncologists and attached a slideshow that provided a comparison between Signatera and an unnamed "Tumor-naïve" approach based in part on data from the Reinert and Parikh Studies. *E.g.*, 11-ER-2726-2738 (TX-365) (slideshow).

Natera also prepared a seven-page document titled "A Comparison of Tumor-Informed and Tumor-Naïve Approaches for Early Stage Molecular Residual Disease (MRD) Detection," sometimes referred to as the "White Paper." 11-ER-2697-2705 (TX-120). The White Paper, which was distributed broadly to oncologists via mail, included a comparison between Signatera's "Tumor-informed" approach and an unnamed "Tumor-naïve" approach. 11-ER-2698-2699 (TX-120). As part of this discussion, the White Paper compared data from the Reinert and Parikh Studies, citing to both in endnotes. 11-ER-2700 (TX-120).

Natera also created a one-page table comparing data on Signatera and Reveal, again with citations to the studies. This document—which Guardant has labeled "[t]he centerpiece of Natera's [purportedly] false ads," 2-ER-190

- 14 -

(Guardant's JMOL opposition), even though it faithfully reproduces data from the studies—is reproduced below:

## Signatera vs. Reveal performance comparison

| | Signatera | Reveal |
|---|---|---|
| Validation data published or presented (# patients analyzed) | > 2,000[1,2] | < 150[4,5] |
| Pre-surgical sensitivity in CRC | 89-94%[1,3] | 47%[4] |
| Failure rate in CRC – tissue and plasma combined | < 3%[3] | 12-14%[4] |
| Number of blood tubes required | 2 | 4 |
| Diagnostic lead time vs. radiographic recurrence in CRC (avg) | 8.7 months[1] | ~4 months[4] |
| Post-surgical NPV/PPV in CRC (30 days post-surgery) | 88% / 100%[*,1] | not reported[4] |
| Serial longitudinal NPV in CRC | 97%[1] | 82%[4] |
| Serial longitudinal Hazard Ratio in CRC | 43.5[1] | 11.4[4] |
| Serial longitudinal sensitivity in CRC | 88-94%[1,2] | 69%[4] |
| Quantitation of ctDNA burden for monitoring purposes | Tumor copies per mL | none |

[*]Calculated/derived from study data.
[**]Three in the total surgical positive patients cleared ctDNA with adjuvant chemotherapy and did not relapse.
1. Reinert T, Henriksen TV, Christensen E, et al. Analysis of plasma cell-free DNA by ultradeep sequencing in patients with stages I to III colorectal cancer. JAMA Oncol. 2019;5(8):1124-1131.
2. Data presented at conferences or published 2017-2021. Data on file.
3. CIRCULATE data on file.
4. Parikh AR, et al. Minimal Residual Disease Detection using a Plasma Only Circulating Tumor DNA Assay in Colorectal Cancer Patients. Clin Cancer Res. April 28, 2021.
5. Wan J, et al. Clinical impact of circulating tumor DNA after total neoadjuvant treatment in locally advanced rectal cancer: A biomarker study from the GEMCAD 1402 Trial. Clin Cancer Res. April 1, 2021.
Not for reproduction or further distribution.

🔵 natera

11-ER-2707 (TX-126).

Guardant—for its part—had also evaluated the relative performance of Signatera and Reveal by comparing the results of the Reinert and Parikh Studies. For example, Guardant relied on direct comparisons of data from the Parikh and Reinert Studies when seeking Medicare coverage for Reveal. 3-ER-589. In November 2020, Guardant gave a presentation to the Molecular Diagnostics Services (MolDX), an organization that helps the Centers for Medicare and Medicaid Services determine which diagnostic tests should be covered and

- 15 -

reimbursed by Medicare.  *See* 3-ER-575, 590-591.  Guardant's presentation

included the following slide:



## GH CRC MRD Test Meets LCD Requirements

| Performance Parameter | Signatera (Reinert et al) | Guardant (Parikh, et al) |
|---|---|---|
| Landmark sensitivity<br>*Single post-treatment timepoint* | 50%<br>(7/14) | 56%<br>(15/27) |
| Surveillance sensitivity<br>*Collected within ~4mo intervals* | 88%<br>(14/16) | 91%<br>(20/22) |
| Specificity<br>*# ctDNA-/# recurrence free* | 98%<br>(58/59) | 100%<br>(37/37) |
| PPV<br>*# recurred/# ctDNA+* | 93%<br>(14/15) | 100%<br>(20/20) |
| Lead time | 8.7mo | 6.9mo |
| CEA Sensitivity / Specificity | 69% / 64%<br>*(surveillance)* | 35% / 81%<br>*(landmark)* |

GH CRC MRD Test meets the LCD Requirements:
- Identifies recurrence prior to radiographic recurrence
- Sensitivity/Specificity better than CEA
- Performance similar to Signatera

GUARDANT

11-ER-2767 (TX-585).  Guardant similarly made direct comparisons between the

Parikh and Reinert study data in its advertising.  For example, on April 30, 2021,

Guardant issued a press release, claiming that Reveal has achieved "industry-

leading sensitivity," citing both the Parikh and Reinert Studies.  6-ER-1309; 11-

ER-2780-2783 (TX-650).

### E.    District Court Proceedings

### 1.    Both Parties Allege False Advertising

In late May 2021, Guardant sued Natera in the Northern District of

California over the documents Natera distributed in Spring 2021, alleging claims

for false advertising under the Lanham Act and under California law.  *E.g.*, 13-ER-

3047 (MSJ order). Guardant's theory was that Natera's comparison of the results of the Parikh and Reinert Studies was improper because they used different methodologies—resulting in a necessarily false and/or misleading comparison. 11-ER-3050-3052.

Natera filed its own false advertising suit in federal court in Texas—where Natera is headquartered—one day after Guardant's suit was filed in California. *See generally Natera, Inc. v. Guardant Health Inc.*, No. 6:21-cv-00540 (W.D. Tex. May 28, 2021). Natera subsequently voluntarily dismissed the Texas case and converted its allegations into counterclaims in this case, arguing, *inter alia*, that Guardant (1) manipulated the methods and data relied upon in the Parikh Study to present a more favorable outcome and (2) reported those manipulated results in its advertising. 13-ER-3130-3147 (MSJ order).

### 2. The Court Rules In Guardant's Favor On Summary Judgment And *Daubert* Issues

At summary judgment, the court erroneously resolved two central legal issues in Guardant's favor. First, in largely denying Natera's motion for summary judgment against Guardant, the court adopted Guardant's position that advertisements that make an "apples-to-oranges" comparison (*i.e.*, comparing two things that have some differences) are necessarily literally false. 13-ER-3050-3051. The court's primary authority for this holding—and the only decision from within the Ninth Circuit that it identified—was the court's own ruling in a prior

- 17 -

case involving purportedly non-comparable ***products***. 13-ER-3050-3051 (quoting *Clorox Co. v. Reckitt Benckiser Grp. PLC*, 398 F.Supp.3d 623, 637 (N.D. Cal. 2019)).

Second, the court held that Natera's counterclaims challenging the reliability of the Parikh Study were barred under the Second Circuit's decision in *ONY, Inc. v. Cornerstone Therapeutics, Inc.*, 720 F.3d 490 (2d Cir. 2013), which creates near-blanket protection for statements made in peer-reviewed studies, 13-ER-3069-3070 (discussing *ONY* rule). The court thus significantly narrowed Natera's affirmative case, stating that "Lanham Act claims based on peer-reviewed, published studies are outside the purview of this Court, unless the content is 'fabricated or fraudulently created.'" 13-ER-3069.

The court also ruled in Guardant's favor at the *Daubert* stage, holding that Guardant's damages expert could testify that Guardant was entitled to $74.5 million in compensatory damages. 13-ER-3082-3083, 3087. The court reached this conclusion even though the expert's compensatory damages estimate simply took the amount Natera spent on advertising related to Reveal and multiplied it by three. 13-ER-3085-3087; 13-ER-3127 (expert report).

**3.** **The Court Rules In Guardant's Favor On Jury Instructions Regarding The Test For Literal Falsity, The Availability Of Punitive Damages, And Liability For Statements Based On Peer-Reviewed Studies**

At the jury instruction stage, too, the court ruled erroneously in Guardant's favor on three key issues.

*First,* consistent with the court's earlier ruling, the jury was instructed that "[a]dvertisements using an 'apples-to-oranges' comparison are literally false by necessary implication where things that are non-comparable are portrayed as otherwise equivalent." 1-ER-90. *Second*, the court instructed the jury that it was bound by the *ONY* rule—*i.e.*, that "[s]tatements in a commercial advertisement or promotion which are based on test results from a peer-reviewed, published scientific study *cannot* be literally false" unless one of three exceptions applied. 1-ER-92. *Third*, the jury was instructed that it could award punitive damages based upon a finding of liability under the Lanham Act. *See* 1-ER-98, 102. The court's ruling on this point was based on its (erroneous) conclusion that the legal test for false advertising under California's common law (which permits punitive damages) is identical to the Lanham Act test for liability (which does not). 13-ER-3024-3025.

- 19 -

### 4. The Jury Awards Guardant Nearly $300 Million And Natera Nothing

After an eight-day trial, a jury found that Natera had engaged in willful false advertising in violation of the Lanham Act but that Guardant was not liable. 2-ER-199-203 (jury verdict form). The jury awarded $75 million in compensatory damages (almost exactly the amount Guardant sought), recommended disgorgement of $42 million, and concluded that Guardant was "entitled to recover" $175.5 million in "punitive damages from Natera for [Natera's] violation of false advertising under California common law." 2-ER-200-201. During post-trial proceedings, the court slightly reduced the disgorgement award to $37 million but denied Natera's motion for JMOL or a new trial. *See generally* 1-ER-2-55. The court also concluded the jury's findings—that Natera violated the Lanham Act and Guardant did not—required the court to hold Natera violated two related California statutes (the Unfair Competition Law and the False Advertising Law) and Guardant did not. 1-ER-26-27 ("UCL[] and FAL claims rise and fall with a parallel Lanham Act claim").

In total, Guardant was awarded over $287 million for a handful of documents transmitted over the course of a few months, which indisputably accurately reproduced factual information from the Reinert and Parikh Studies.

### SUMMARY OF THE ARGUMENT

The decision below rests on three sets of legal errors that require reversal.

- 20 -

**I.** The district court erred by lowering the bar for Guardant to prevail. Specifically, Guardant's theory of the case was that Natera made an inapt comparison between the Reinert Study (which addressed Signatera's efficacy) and the Parikh Study (which addressed Reveal's). The court's instruction adopted that theory, telling the jury that—to find Natera liable for a "false-by-necessary-implication" advertisement—Guardant needed to establish only that Natera's advertisements made an "apples-to-oranges" comparison between the Parikh and Reinert Studies. This dramatic expansion of the narrow "false-by-necessary-implication" doctrine of Lanham Act liability was error.

That doctrine applies only when the advertisement in question conveys a clear and unambiguous message that is false. This Court has never suggested it extends to any advertisement that could be said to compare two things with some differences—even if there is no showing that anyone was actually misled or could have been misled. What's more, the use of the colloquial phrase "apples to oranges" invited the jury to find liability based on even the slightest difference between the two things being compared. Guardant cannot show this error was harmless, as it relied on the "apples-to-oranges" test throughout the trial and told the jury in closing that it was an "element[]" of the Lanham Act.

**II.** The court also erred by raising the bar for Natera to prevail on its false advertising claims. Natera contended Guardant had improperly insinuated itself in

the Parikh Study, leading the Study to make false and misleading claims about its metrics and the conditions under which it was performed—conclusions that Guardant adopted in its own advertising. The court's summary-judgment order and jury instructions undermined Natera's theory by wrongly adopting the Second Circuit's decision in *ONY, Inc. v. Cornerstone Therapeutics, Inc.*, which grants immunity to advertising that accurately reports the results of peer-reviewed studies unless the plaintiff can show the study itself was fraudulent or fabricated. That approach contradicts this Court's precedent (which treats any specific and measurable claim as actionable if it can be proven false) and common sense. Worse yet, the court held that only ***Guardant's*** advertisements were entitled to protection under this rule even though both sides' advertisements reported the findings of peer-reviewed studies. If *ONY* applies at all, it should shield Natera and Guardant alike.

**III.** The court also made evidentiary and instructional errors that permitted the jury to award nearly $300 million.

*First*, the court erred by permitting Guardant's damages expert to testify that—as compensation for the purportedly false advertisements—Guardant was entitled to a 3X multiplier of Natera's spending on advertising related to Reveal, meaning that the jury was told Guardant was entitled to nearly $75 million instead of $25 million. The expert's testimony (which the court acknowledged was

"shaky" and based on "weak" reasoning) should have been excluded under *Daubert*/FRE 702 because it was not based on a reliable methodology, but rather on sources like ████████████ and conclusory testimony from Guardant's CEO combined with basic arithmetic. If FRE 702 has any force, it should bar an expert from serving as a human calculator in order to convince a jury to treble an eight-digit compensatory damages award.

*Second*, the court erred by permitting the jury to impose $175.5 million in punitive damages. Fundamentally, the court erred by instructing the jury that they "must" find liability under the California common law (and thus could award punitive damages) if they found liability under the Lanham Act. The California Supreme Court and this Court have both held the California common law is limited to situations in which the defendant "pass[es] off" a competitor's products as its own. That is the precise opposite of what Guardant alleged here. In any event, no reasonable jury could find by clear and convincing evidence that Natera engaged in the kind of bad faith and despicable conduct needed to justify punitive damages. At minimum, given Natera's lack of reprehensibility and the high compensatory damages award, due process limits punitive damages to a 1:1 ratio to compensatory damages—here, no more than $75 million.

- 23 -

## ARGUMENT

**I.  THE DISTRICT COURT ERRED BY INSTRUCTING THE JURY THAT IT COULD FIND NATERA'S ADVERTISEMENTS "LITERALLY FALSE" SIMPLY BECAUSE THE ADVERTISEMENTS PRESENTED AN ALLEGED "APPLES-TO-ORANGES" COMPARISON**

At the core of the Lanham Act is the requirement that a plaintiff prove that the defendant made a "false or misleading" advertisement. 15 U.S.C. § 1125(a)(1)(B). A plaintiff prevails on this element if it shows the statement was "literally false" or "that the statement was literally true but likely to mislead or confuse consumers." *Southland Sod Farms v. Stover Seed Co.*, 108 F.3d 1134, 1139 (9th Cir. 1997).

At trial, Guardant's case rested on a literal falsity theory. 1-ER-4; 9-ER-2224-2226. But Guardant could not argue Natera's comparisons were false on their face because the court had already held that Natera's advertisements accurately reproduced the findings of the Reinert and Parikh Studies. 13-ER-3050 (MSJ order). Guardant instead contended the comparisons were "false by necessary implication" because they supposedly presented an "apples-to-oranges" comparison of data from the two studies. *See* 9-ER-2224 (Guardant's counsel asserting "[y]ou may be wondering why we've talked about *apples-to-oranges comparisons* so many times[.] It's actually one of the elements of a Lanham Act [claim]; that *if you do this, it is necessarily a false and misleading statement*."). The court cemented Guardant's trial argument in the jury instructions, informing

the jury: "Advertisements using an 'apples-to-oranges' comparison are literally false by necessary implication where things that are non-comparable are portrayed as otherwise equivalent." 1-ER-90. But the "false-by-necessary-implication" theory of liability—if such a theory exists at all—is extremely narrow, and not satisfied simply because a plaintiff alleges a defendant compared two things with some differences. What is more, the court's instruction effectively gave the jury no guidance on the *degree* of difference required, thus inviting the jury to find an "apples-to-oranges" comparison and literal falsity based on *any* difference no matter how slight.

This Court "review[s] de novo whether an instruction states the law correctly." *Blumenthal Distrib., Inc. v. Herman Miller, Inc.*, 963 F.3d 859, 868 (9th Cir. 2020). Here, the instruction was error because it impermissibly expanded the scope of the false-by-necessary-implication doctrine by permitting a finding of *literal* falsity based on an inherently *subjective* evaluation of the degree of difference necessary to constitute "apples-to-oranges" comparison. *See, e.g.*, 1-ER-118 (collecting Natera's objections to the "apples-to-oranges" concept). To Natera's knowledge, no appellate court has ever applied, affirmed, or even mentioned the district court's novel "apples-to-oranges" test.

- 25 -

**A.** **The District Court Erred By Instructing The Jury On The "Apples-To-Oranges" Test**

      **1.** **The False-By-Necessary-Implication Doctrine Is A Narrow Exception To The Rule That A Plaintiff Must Show A Statement Was False On Its Face Or Misled Consumers**

The false-by-necessary-implication doctrine is a narrow exception to the rule that a plaintiff must establish that an advertisement is false on its face or take on the burden of showing the advertisement "misled, confused, or deceived the consuming public." *Southland Sod*, 108 F.3d at 1140. The doctrine creates "a hazy zone in the law between the otherwise discrete categories of 'literally false' and 'misleading'" that "mak[es] the rules of false advertising more unpredictable and uncertain" and "rais[es] the costs of litigation." 4 McCarthy, *McCarthy on Trademarks and Unfair Competition* § 27:54.50 (5th ed. 2025). The doctrine's origins have "never [been] clearly explained" and it has been criticized as "having no statutory basis" and inequitably "lessening the burden of proof on [the] plaintiff." *Id.* & n.5. At least the Fifth and Seventh Circuits have refrained from deciding whether the "'false by necessary implication' doctrine" is even a legitimate basis for Lanham Act relief. *Eastman Chem. Co. v. Plastipure, Inc.*, 775

F.3d 230, 241 (5th Cir. 2014); *Eli Lilly & Co. v. Arla Foods, Inc.*, 893 F.3d 375, 383 n.3 (7th Cir. 2018).[5]

This Court, for its part, has relied on the doctrine only once in a published opinion and did so without analyzing its metes and bounds. Specifically, this Court stated: "When evaluating whether an advertising claim is literally false, the claim must always be analyzed in its full context. … Thus courts have held that a claim can be literally false 'by necessary implication.'" *Southland Sod*, 108 F.3d at 1139. Virtually every other circuit that has adopted the doctrine, however, has expressly underscored its circumscribed reach. As the First Circuit has summarized, "[a] claim is conveyed by necessary implication when, considering the advertisement in its entirety, the audience ***would recognize the claim as readily as if it had been explicitly stated***." *Clorox Co. P.R. v. Proctor & Gamble Com. Co.*, 228 F.3d 24, 35 (1st Cir. 2000); *accord Groupe SEB USA, Inc. v. Euro-Pro Operating LLC*, 774 F.3d 192, 198 (3d Cir. 2014) (same); *Innovation Ventures, LLC v. N.V.E., Inc.*, 694 F.3d 723, 735 (6th Cir. 2012) (same); *Time Warner Cable, Inc. v. DIRECTV, Inc.*, 497 F.3d 144, 158 (2d Cir. 2007) (same); *Zoller Laboratories, LLC v. NBTY, Inc.*, 111 F. App'x 978, 981 (10th Cir. 2004) (same);

---

[5] As detailed below, this Court has adopted at least some form of the doctrine in *Southland Sod*. Natera preserves for *en banc* review whether this Court should overrule this precedent and reject the false-by-necessary-implication doctrine.

*Scotts Co. v. United Indus., Corp.*, 315 F.3d 264, 274 (4th Cir. 2002) (similar). Put another way, "an advertisement can be literally false even though it does not explicitly make a false assertion, if the words or images, considered in context, ***necessarily and unambiguously*** imply a false message." *Time Warner*, 497 F.3d at 148.

This standard is (and should be) difficult to meet. "The greater the degree to which a message relies upon the viewer or consumer to integrate its components and draw the apparent conclusion, … the less likely it is that a finding of literal falsity [by necessary implication] will be supported." *Clorox*, 228 F.3d at 35. Accordingly, "[c]ommercial claims that are implicit, attenuated, or merely suggestive usually cannot fairly be characterized as literally false." *Id.* "Similarly, a factfinder might conclude that the message conveyed by a particular advertisement remains so balanced between several plausible meanings that the claim made by the advertisement is too uncertain to serve as the basis of a literal falsity claim." *Id.* To be sure, "in that case it could still form the basis for a claim that the advertisement is ***misleading***," but such an advertisement is not literally false by implication. *Id.*; *cf. Partington v. Bugliosi*, 56 F.3d 1147, 1159 (9th Cir. 1995) (when "the question of truth or falsity is a close one," courts should "err on the side of nonactionability").

**2. The "Apples-To-Oranges" Instruction Permitted The Jury To Find Literal Falsity Based On Subjective Considerations Where An Advertisement Did Not Convey Even A Single, Unambiguously False Statement**

The instruction here was flatly inconsistent with the narrow scope of the false-by-necessary-implication doctrine. In relevant part, the jury instruction provided:

> The [plaintiff] must prove a statement is false or misleading in one of two ways:
>
> 1. By showing that the statement is literally false. Only an unambiguous message can be literally false. A statement may be literally false on its face, that is, when it explicitly states something untrue. A statement also may be literally false by necessary implication. A statement is literally false by necessary implication when it does not explicitly state something that is untrue, but considering the advertisement in its entirety, the only reasonable interpretation of the statement is that it is untrue. ***Advertisements using an "apples-to-oranges" comparison are literally false by necessary implication where things that are non-comparable are portrayed as otherwise equivalent.***

1-ER-90; *see also* 1-ER-92 (related instruction, noting as an example, that a statement can be literally false if it "compare[s] test results from a different study when the results are not actually comparable").

Put simply, this language instructed the jury on the limitations of the false-by-necessary-by-implication doctrine, but then provided the jury with a shortcut—the jury could ignore those limits so long as it found that the advertisements made an "apples-to-oranges" comparison. That shortcut cannot be squared with the

- 29 -

caselaw, which requires the audience be able to identify a single, unambiguously false claim "as readily as if it had been explicitly stated." *E.g.*, *Clorox*, 228 F.3d at 35; *supra* pp. 27-28.

To be sure, "[a] false advertising claim can … depend on the consumer to draw conclusions that are logically necessary from an ad's statements." *Design Res., Inc. v. Leather Indus. of Am.*, 789 F.3d 495, 502-503 (4th Cir. 2015). Thus, for example, an advertisement that claimed a company's motor oil "outperform[ed] *any leading motor oil* against viscosity breakdown" implicitly conveyed a message that the company's motor oil was more effective "against engine wear" than "that of its competitors." *Castrol Inc. v. Pennzoil Co.*, 987 F.2d 939, 946-947 (3d Cir. 1993).

A plaintiff cannot, however, "re[ly] on the consumer to scrape together" a purportedly false conclusion—a coherent message must be apparent from "the face of the ad[vertisement]." *Design Res.*, 789 F.3d at 502-503 (rejecting plaintiff's claim that an advertisement that "refers only to products marketed as leather … unmistakably referred to products not marketed as leather"). That is precisely what the instruction (impermissibly) permitted the jury to do—jump to the conclusion that Natera's advertisements as a whole were literally false if any aspect of the advertisements compared two items the jury believed were different in some way. *See, e.g.*, *Chuman v. Wright*, 76 F.3d 292, 294-295 (9th Cir. 1996) (reversing

- 30 -

where jury instruction provided an "improper alternative grounds for liability" that omitted a required element).

Indeed, Guardant's counsel urged the jury to read the instruction in precisely that way. After asking the jury the rhetorical question of "what does it mean to be false or misleading under the Lanham Act," Guardant's counsel identified the apples-to-oranges sentence as "the really critical [instruction] here":

> You may be wondering why we've talked about apples-to-oranges comparison so many times, come up over and over again. This is why. It's actually one of the elements of a Lanham Act [claim]; that *if you do this, it is necessarily a false and misleading statement*. Again, these are not my words. These are instructions from the Court.

9-ER-2224-2225.

In addition to allowing the jury to skip over the normal test for falsity by necessary implication, the court also injected subjectivity into an objective analysis by relying on the colloquial phrase "apples-to-oranges." *Cf. Chuman*, 76 F.3d at 294 (criticizing district court for adding the informal phrase "team effort" to a jury instruction). While the court did not squarely define the term, the expression in common parlance means simply "[u]nlike objects," *see* Ammer, *The American Heritage Dictionary of Idioms* 13 (2d ed. 2013), thus inviting the jury to find literal falsity based on *any* difference between the studies, no matter how small. Whether two things are so unlike or dissimilar as to be incomparable is necessarily a question of judgment that turns on whether the intended audience (here,

- 31 -

oncologists) would be deceived by it—*i.e.*, the kind of analysis that this Court has indicated applies when determining whether an advertisement is **misleading**. *See supra* p. 28. After all, it would not be literally false to suggest that apples are superior to oranges if the audience was looking for a fruit that could be grown in a colder climate and does not need to be peeled. Nor is it literally false to suggest apples and oranges are similar in various ways. Both fruits are "[g]rown in orchards," come from "[f]lowering trees," "[m]ay be eaten," are sweet, and have a spherical shape. Barone, *Comparing Apples and Oranges: A Randomized Prospective Study*, 321 British Med. J., 1569, 1569-1570 & tbls.2-3 (2000) (criticizing (with tongue-in-cheek) use of term "apples to oranges" in medical literature).

The court went astray by relying on its own prior opinion in *Clorox Co. v. Reckitt Benckiser Group* (*Reckitt*), 398 F.Supp.3d 623 (N.D. Cal. 2019), which is the apparent origin of the "apples-to-oranges" test. *See, e.g.*, 1-ER-6-7, 18-19 (post-trial order); *see also* 13-ER-3050-3052 (MSJ order). Specifically, the court faulted Natera for not identifying any "case law demonstrating th[e] instruction" (and by extension, *Reckitt*) "incorrectly stated the law." 1-ER-18. But Natera's inability to identify any decision squarely rejecting a test that the court itself invented a few years prior is a sign only that the test is a novel one—not that Natera's position lacks merit. And *Reckitt*'s apples-to-oranges test is inconsistent

with the basic legal principles discussed above—*i.e.*, that "the greater degree to which a message relies upon the viewer or consumer to integrate its components and draw the apparent conclusion, … the less likely it is that a finding of literal falsity will be supported." *Design*, 789 F.3d at 502. Natera cited that precise statement during post-trial briefing. 2-ER-196.

Regardless, *Reckitt* is easily distinguishable, as it dealt with the special context of when "non-comparable ***products*** are portrayed as otherwise equivalent" and the advertisement thus "omits differences which would have been material to the recipients." 398 F.Supp.3d at 637-638. For example, an advertisement that claims a certain type of steam iron is more powerful than "leading competition in the same price range" but uses pictures of a competitor steam iron in a ***different*** price range is literally false within the view of the *Reckitt* court. *Id.* So too is an advertisement that claims a restaurant chain's sandwich has "more than 2x the meat" of a competitor's sandwich but uses pictures of the competitor's "single-portion … sandwich" rather than the competitor's "comparable 'double meat' sandwich." *Id.* at 638.

In the scenarios considered by *Reckitt*, the advertisement makes an explicit, unambiguous claim in written text or spoken word that was rendered false by the images shown. Such a rule has no application to a case like this one. There can be no dispute that the underlying products—Signatera and Reveal—were indeed

- 33 -

comparable. Guardant itself compared them. *Supra* pp. 15-16. There was also no textual claim in the advertisements at issue that was rendered false by images. Indeed, many of the pages the trial focused on did not even mention Reveal by name, and the advertisement that Guardant labeled the "centerpiece" of Natera's advertising was a chart with a side-by-side comparison of statistics drawn directly from the Reinert and Parikh Studies. *See supra* pp. 14-15.

Even Guardant did not truly believe the two studies here were incomparable. As Guardant's witness admitted at trial, it made internal comparisons of the two studies. *See* 3-ER-671-672 ("[W]e definitely compared Signatera to Guardant Reveal in internal documents, for sure."); *see* 11-ER-2803 (TX-729) (chart comparing metrics based on Reveal and Parikh Studies). And Guardant used a comparison chart, with many of the same metrics that appear in Natera's advertisements, when it applied for Medicare coverage. *See supra* p. 16; *see also* 11-ER-2669 (TX-89) ("Clinical Validity Summary" noting *inter alia* that "[l]andmark performance was … similar" between the Parikh and Reveal Studies). Guardant cannot reasonably argue Natera's approach was improper when it relied on the same comparison.

## B. The Court's Error Was Not Harmless

When a jury has been erroneously instructed, courts must "first presume prejudice." *BladeRoom Grp. Ltd. v. Emerson Elec. Co.*, 20 F.4th 1231, 1243 (9th

- 34 -

Cir. 2021). That presumption can be overcome only if the party benefiting from the error can show it is "more probable than not that the jury would have reached the same verdict had it been properly instructed." *Id*. Guardant cannot meet that burden here.

Guardant's case rested on the jury finding that Natera's advertisements were false by necessary implication. *See supra* p. 24; 1-ER-4 (JMOL ruling that "[t]he jury found Natera's advertisements were false by necessary implication"); 1-ER-33 (similar statement in injunction ruling).[6] But under the proper test, Natera's advertisements could not be found false by necessary implication—they compared similar products, competing in the same market, and (according to the district court), accurately restated the findings of the Parikh and Reinert Studies. To the extent the advertisements had any clearly discernable message at all, it was that— in Guardant's words during opening—Signatera was "superior" to Reveal. *See* 3-ER-413-414; *see also* 3-ER-611-612 (advertisements represented Signatera "at its best side" while Reveal was "represented in its worst context"). A generic claim of product superiority is unactionable puffery. *See Cook, Perkiss & Liehe, Inc. v. N.*

---

[6] While the district court later stated in passing that "[t]here was substantial evidence that the comparisons of data from the two products presented by Natera were ***misleading***," 1-ER-6; *see also* 1-ER-5, its subsequent legal analysis makes clear it was again referring to the false-by-necessary-implication doctrine, *see* 1-ER-6-7 (discussing *Reckitt*).

*Cal. Collection Serv. Inc.*, 911 F.2d 242, 246 (9th Cir. 1990); *see also* 1-ER-97 (jury instruction).  Indeed, the court previously granted summary judgment in *Guardant's* favor on a very similar basis by rejecting Natera's claim that statements that Reveal was an "industry-leading" test were false or misleading. 13-ER-3077.

In its post-trial ruling, the court concluded that *a* reasonable jury could have found the advertisement's side-by-side comparisons of the Guardant and Parikh Studies lacked "*adequate context* of the differences in the studies"—primarily, the fact that the studies relied on different sample volumes.  1-ER-5.  But the court's analysis considered only what a jury *could* permissibly find and, in any event, applied the flawed apples-to-oranges test rather than the more demanding standard for misleading statements (*i.e.*, likely or actual consumer confusion).  1-ER-5-7; *see also supra* n.6.  Even the significance of the specific difference the court emphasized—the sample-size issue—was hotly contested at trial.  One of Guardant's own scientists who assisted with the Parikh Study acknowledged that Reveal did not require a minimum *quantity* to detect ctDNA and focused on the *quality* of individual samples.  *See* 6-ER-1341-1343, 1349-1355; *see also* 11-ER-2748-2749 (TX-501) (same employee noting in email that "[w]e used to have a minimum cfDNA requirement … but as we have gotten more experienced, we rely more on the Q[uality] A[ssurance]/Q[uality] C[heck] metrics after processing the

DNA and if the sample passes all of our requirements, we will process."); 6-ER-1472 (Guardant witness admitting that the "Parikh study didn't actually look at how the volumes would have affected the performance"). Tellingly, neither the court nor Guardant have identified a single case from any jurisdiction where a similar granular, disputed distinction was sufficient to render an advertisement *literally false* by necessary implication.[7]

In any event, Guardant cannot reasonably meet its burden to show that such evidence was sufficient to establish a *likelihood* that the jury would have arrived at the same conclusion had it been correctly instructed on the law, particularly given that Guardant itself believed the two studies to be similar enough to compare them, both in submissions to MolDX and in internal discussions. *See supra* pp. 16, 34. Nor can Guardant rehabilitate the "apples-to-oranges" instruction by pointing to other jury instructions. The court's post-trial ruling suggested that any error in the "apples-to-oranges" instruction was tempered by a later instruction that "provided

---

[7] In the post-trial briefing, Guardant asserted two witnesses (a co-author of the Reinert Study and a former Natera employee) had conceded that comparing studies based on different sample sizes would not be an "apples-to-apples" comparison. *See* 10-ER-2384 (Dr. Andersen referencing "apples and pears"); 4-ER-787 (former employee stating "not apples-to-apples"). Not only does this line of argument rely on the wrong legal standard (apples-to-oranges), but it overstates the testimony. Dr. Andersen was not addressing differences between Reveal and Signatera, and the former employee was merely making the point that the data in Natera's comparisons came from two different studies—not that the studies were incomparable.

an accurate guide by which the jury could determine in the context of this case, whether the Parikh Study and the Reinert Study were, in fact, not fairly comparable." *See* 1-ER-18-19 (citing Instruction No. 34). But "[e]rroneous instructions can be corrected by the trial judge only by expressly correcting them and by directing the members of the jury to expunge the erroneous statements from their minds." *United States v. Liu*, 731 F.3d 982, 993 (9th Cir. 2013). That did not happen here.

Regardless, the supposedly curative instruction, which explained how to "determin[e] whether a statement actually or had a tendency to deceive the target audience," 1-ER-18-19, is inapposite because it dealt with the test for whether an advertisement is *misleading*—not literally false. In fact, the instruction told the jury *not* to consider whether the challenged advertisement actually or had a tendency to deceive if it found literal falsity. 1-ER-93 (jury "may presume" deception if it finds literal falsity). Guardant's counsel leveraged this instruction in closing, telling the jury that there was no need to decide whether the advertisements were misleading precisely because the jury could find Natera liable based merely on the "apples-to-oranges" instruction:

> So a presumption means you can assume this element has been satisfied .… ***Here you can presume that consumers were deceived by Natera's ads if you find those ads to be false or false by, quote, necessary implication. Meaning, they compared apples-to-oranges.*** They compared two studies that weren't comparable.

9-ER-2226.[8]  Given Guardant encouraged the jury to "***presume*** that consumers were deceived" because Natera "compared apples-to-oranges," *id.*, Guardant plainly cannot establish a likelihood that a properly instructed jury would have reached the same conclusion, *see BladeRoom*, 20 F.4th at 1243.  And because the court's finding that Natera violated California's UCL and FAL turned solely on the jury's tainted Lanham Act finding, *see supra* p. 20, those findings should be vacated as well.

### C.  If This Court Orders A New Trial On Liability, The Seventh Amendment Requires A New Trial On Damages As Well

The Seventh Amendment forbids a partial new trial unless "the issue to be retried is … distinct and separable from the others."  *Gasoline Prods. Co. v. Champlin Refining Co.*, 283 U.S. 494, 500 (1931).  Here, Guardant's theory of liability was indisputably closely intertwined with its punitive damages theory, as both required the jury to find that Natera had engaged in false advertising.  *E.g.*, 9-ER-2258 (Guardant's counsel arguing punitive damages were justified because Natera "intentionally misrepresented the data" and "concealed other data"); *see also Marroquin v. City of Los Angeles*, 112 F.4th 1204, 1211 (9th Cir. 2024) (when party seeks punitive damages, "liability issues are necessarily interwoven with

---

[8] The jury's finding that Guardant "prove[d] by a preponderance of the evidence that Natera's false or misleading advertisement(s) actually deceive or have a tendency to deceive a substantial segment of consumers," 2-ER-199, must be read in light of this exhortation from Guardant's counsel.

damages issues because the damages 'depend on the degree of culpability of the defendant'"). Guardant's corrective advertising and disgorgement awards were also intertwined with liability, as the jury was instructed monetary relief must be "attributable to the ***wrongdoer's unlawful conduct***." *See* 1-ER-99.

## II. THE DISTRICT COURT ERRED BY HOLDING THAT THE SECOND CIRCUIT'S "DEFERENTIAL" REVIEW OF ADVERTISEMENTS THAT CONTAIN STATEMENTS MADE IN PEER-REVIEWED STUDIES APPLIED TO NATERA'S (BUT ONLY NATERA'S) CLAIMS

### A. The *ONY* Decision Cannot Be Squared With This Court's Precedent And—Regardless—Is Unduly Protective Of *Advertisements* That Reference Peer-Reviewed Studies

A Lanham Act plaintiff can prove that advertisements based on testing are false by showing that the underlying test was "not sufficiently reliable to permit one to conclude with reasonable certainty that they established the claim made." *Southland Sod*, 108 F.3d at 1139. A plaintiff can meet that burden by, *inter alia*, "attacking the validity of the defendant's tests directly." *Id.* Natera's counterclaims in this case followed that guidance, challenging Guardant's advertisements (press releases, an email, and a conference presentation) referencing the Parikh Study on the basis that the study was unreliable. *See supra* p. 17. Specifically, due to Guardant's manipulation, and contrary to claims in the Parikh Study, the study was *inter alia* retrospective, unblinded, and inflated key performance metrics such as sensitivity. *See supra* pp. 9-11.

- 40 -

The court, however, rejected one aspect of Natera's counterclaims at summary judgment (the "inflated metrics" claim)—and made it significantly more difficult for Natera to prevail on its remaining claims before the jury—by embracing the Second Circuit's ruling in *ONY Inc. v. Cornerstone Therapeutics, Inc.*, 720 F.3d 490 (2d Cir. 2013). *ONY* provides that advertising statements based on **peer-reviewed** studies "are not grounds for a claim of false advertising under the Lanham Act" unless the plaintiff can prove that the "data presented in the article were fabricated or fraudulently created." *Id.* at 497-498. While the court acknowledged in an early ruling that this Court "has not embraced the deferential approach employed in *ONY*," 10-ER-2511, it subsequently applied the Second Circuit's rule to hold that Natera could challenge the Parikh Study's validity (and, by extension, Guardant's advertisements relying on it) only by showing the study was fraudulent. 13-ER-3069-3070 (MSJ order); 1-ER-92 (jury instruction); *see also, e.g.*, 10-ER-2493; 13-ER-3011 n.2 (noting Natera's objections to application of *ONY* doctrine). The practical effect of this ruling was that Guardant's challenges to Natera's advertising—which simply replicated information from two peer-reviewed studies—could proceed, while many of Natera's challenges to Guardant's advertisements (rooted in Guardant's improper entanglement with the

- 41 -

seriously flawed Parikh Study) could not proceed or were made much more challenging.[9]

The court's ruling was flawed for two distinct reasons. **First**, *ONY*'s reasoning—that disputes over the accuracy of peer-reviewed studies are necessarily "incapable of being proven false" because statements in and based on peer-reviewed articles are "akin to matters of opinion," 720 F.3d at 496-497—is fundamentally inconsistent with this Court's definition of what constitutes an "actionable statement" under the Lanham Act. An advertisement is actionable (as opposed to a statement of opinion) when it includes "a specific and measurable claim, capable of being proved false or of being reasonably interpreted as a statement of objective fact." *Ariix, LLC v. NutriSearch Corp.*, 985 F.3d 1107, 1121 (9th Cir. 2021). Nothing about a peer-reviewed study's nature renders it immune from "being proved false or of being reasonably interpreted as a statement of objective fact," *id.*, or justifies a blanket rule that such studies can be actionable only if found to be "fabricated or fraudulently created." If anything, Guardant's advertisements' reliance on peer-reviewed studies only exacerbated the potential harm by enhancing the perception that the statements were objective, scientifically

---

[9] Both erroneous rulings involving the *ONY* doctrine—at summary judgment and in the jury instructions—are reviewed *de novo*. *See Bell v. Wilmott Storage Servs., LLC*, 12 F.4th 1065, 1068 (9th Cir. 2021) (summary judgment); *supra* p. 25 (*de novo* review of jury instruction).

validated facts.  *See, e.g.*, *Recent Case*, 127 Harv.L.Rev. 1815, 1816, 1822 (2014) (criticizing *ONY* decision as permitting "companies to use controversial publications to present their products as scientifically validated, without any contextual reference to ongoing debate").

*Second*, the *ONY* decision is flawed on its face because it improperly extends blanket First Amendment protection to *commercial* statements.  As the Fifth Circuit has correctly explained in declining to follow *ONY*, "[i]n the commercial context, the First Amendment is no obstacle to enforcement of the Lanham Act."  *Eastman Chem.*,775 F.3d at 236; *accord Bolger v. Youngs Drug Prods. Corp.*, 463 U.S. 60, 68 (1983) ("[A]dvertising which links a product to a current public debate is not thereby entitled to the constitutional protection afforded noncommercial speech.").  Put simply, "[a]dvertisements do not become immune from Lanham Act scrutiny simply because their claims are open to scientific or public debate."  *Eastman*, 775 F.3d at 236; *see also Conformis, Inc. v. Aetna, Inc.*, 58 F.4th 517, 534 (1st Cir. 2023) (similar).

Commentators agree with this approach, noting that the brightline *ONY* rule that scientific conclusions are protected from suit regardless of the forum in which they appear "provide[s] a dangerous shield against Lanham Act liability for unscrupulous advertisers" and creates "a large incentive for corporations to perform studies skewed toward finding favorable results in the hopes that a peer-

reviewed publication will accept them." *Recent Case*, 17 Harv.L.Rev. at 1822; *see also, e.g.*, Roesler, *Evaluating Corporate Speech About Science*, 106 Geo.L.J. 447, 476-477 (2018) (similar).

While the court's motion-to-dismiss ruling acknowledged the important distinction between the overbroad *ONY* rule (all statements from a peer-reviewed study are immune) and the more-tailored *Eastman* approach (an advertisement is not immune just because it accurately quotes a peer-reviewed study), 10-ER-2510-2511, its later summary-judgment and jury-instruction decisions collapsed the distinction. Those rulings held Guardant's advertisements not actionable so long as they accurately reported the results of the Parikh Study and the study was not fabricated or fraudulently created. 13-ER-3070-3071; *see also* 13-ER-3013. By contrast, the court determined Natera's advertisements—which accurately reported the results of the Parikh Study and the Reinert Study—*were* actionable.

The court's adoption of *ONY* in its summary-judgment ruling prevented Natera from arguing that the Parikh Study artificially inflated Reveal's sensitivity and its specificity by excluding certain results using post-hoc revisions of its methodology. 13-ER-3073-3074. Had the court applied the right standard, a finder of fact could have assessed such a claim and determined that the study used a misleading methodology for the reasons explained above. *See supra* pp. 9-11. Given these "triable issues of fact," *Schrader Cellars, LLC v. Roach*, 129 F.4th

- 44 -

1115, 1123 (9th Cir. 2025), the court erred in granting partial summary judgment to Guardant on the "inflated metrics" claim.

For similar reasons, reversal on the remainder of Natera's counterclaims is warranted based on the court's blanket instruction that "[s]tatements in a commercial advertisement or promotion which are based on test results from a peer-reviewed, published scientific study cannot be literally false."  1-ER-92. Guardant cannot reasonably show it is more likely than not that the jury would have reached the same result with proper instructions.  *See BladeRoom*, 20 F.4th at 1243.  Although the court allowed Natera to present some of its claims (*e.g.*, that the study falsely stated it was prospective and blinded), the court wrongly instructed the jury that Natera was required to satisfy a markedly heightened standard to prevail.  Instead of being allowed to prove that the Parikh Study was "not sufficiently reliable" to support Guardant's advertising claims, Natera had to instead prove that the Parikh Study was fraudulent or fabricated—a point Guardant repeatedly emphasized in closing.  *See* 9-ER-2326-2327.  Under the proper standard, the jury would likely have ruled in Natera's favor in light of the numerous methodological problems with the Parikh Study.  *See supra* pp. 9-11. And because the court's holding that Guardant did not violate the California's UCL and FAL turned solely on the jury's tainted Lanham Act verdict, *see supra* p. 20, those findings must be vacated as well.

**B.**     **If This Court Does Adopt The *ONY* Rule, That Rule Should Also Apply To Natera's Statements**

At a minimum, the court erred by giving only Guardant—and not Natera—the benefit of the *ONY* rule.  If accurate statements from peer-reviewed studies are immune from suit regardless of whether they are used in the commercial context, no reasonable jury could have found Natera liable under the Lanham Act because its advertisements also indisputably accurately reproduced the results of peer reviewed studies (and this Court could not have found Natera liable under the UCL and FAL).

After all, as the court recognized, "all Natera's advertising statements at issue are directly derived from the Reinert and the Parikh study."  13-ER-3050.  Indeed, the supposed "centerpiece" of Natera's advertising campaign simply put those results side-by-side, providing citations to the underlying studies, and let the audience of oncologists decide.  "[W]hen the conclusions reached by experiments are presented alongside an accurate description of the data taken into account and the method used, the validity of the authors' conclusions may be assessed on their face by other members of the relevant discipline."  *ONY*, 720 F.3d at 497-498.  And a party cannot be held liable for "presenting accurately [a non-fraudulent] article's … conclusions" in advertisements.  *Id.* at 499.  Rather, under *ONY*, such an advertisement is actionable only if it contains "additional misleading

- 46 -

statements" or "mislead[s] a reader about the conclusions of the article." *Id.* at 492, 499.

The court rejected this argument on the grounds that "*ONY* creates a limited zone of protection around description of peer-reviewed studies" that does not extend to side-by-side comparisons. 1-ER-10-11. But nothing in *ONY* or any other case draws the brightline rule the court applied here—between accurately quoting one study (Guardant) and accurately quoting two studies (Natera). The only authority the court cited for its narrow view of *ONY* was the Fifth Circuit's *Eastman* decision. 1-ER-10. *Eastman*, however, turned on the distinction between when statements appear ***in a peer-reviewed study*** and when those same statements appear ***in a commercial advertisement***. *See supra* p. 43. There is no dispute that Natera's counterclaims focused on statements made in Guardant's commercial advertisements. Guardant admitted as much during the post-trial briefing. *See* 2-ER-191 ("Guardant's ***ads*** … reported the peer-reviewed and published results of the Harvard/Parikh Study.").

## III. THE DISTRICT COURT ERRED BY PERMITTING THE JURY TO AWARD AN INFLATED, NINE-FIGURE SUM FOR ADVERTISEMENTS THAT ACCURATELY REPORTED THE RESULTS OF PEER-REVIEWED STUDIES

### A. The Court Erred By Allowing Guardant To Present An Unreliable Compensatory Damages Theory

"[B]efore admitting expert testimony, the district court must perform a gatekeeping role to ensure that the [proffered] testimony is both relevant and

- 47 -

reliable." *Engilis v. Monsanto Co.*, 151 F.4th 1040, 1047 (9th Cir. 2025). The "proponent of expert testimony" has the burden "to demonstrate each of the [four] requirements of [FRE] 702 by a preponderance of the evidence." *Id.* at 1049-1050. Here, the court abused its discretion in admitting the testimony of James Malackowski, Guardant's damages expert, because that testimony was not rooted in "reliable … principles and methods." *Id.* at 1048-1049; *see also, e.g.*, *Rearden, LLC v. Walt Disney Pictures*, 152 F.4th 1058, 1077-1078 (9th Cir. 2025) (affirming exclusion of damages testimony that "lacked an 'identifiable methodology'").

### 1. Malackowski's 3X Multiplier Was Based On An Unreliable Methodology

Malackowski's methodology for estimating $74.5 million in prospective corrective advertising was unreliable and should have been excluded. Malackowski reached this inflated figure by acting as a human calculator: He took the amount that Natera had spent in on responsive advertising related to Guardant's statements about Reveal—$24.8 million—and multiplied it by three. 13-ER-3086-3087 (*Daubert* order); 1-ER-24 (post-trial ruling). Malackowski asserted that this trebling was appropriate because Guardant would have to spend more money than Natera did on advertising to correct any purported misimpressions generated by Natera's advertising. 13-ER-3086-3087 (*Daubert* order); *see also* 13-ER-3125-3127 (expert report). But Malackowski failed to establish that his 3X multiplier

was in any way an accurate measurement of the cost of corrective advertising. Instead, it was effectively plucked out of thin air. Guardant used Malackowski to put the "imprimatur of an expert" on an "undocumented and dubious damages calculation." *See CareDx, Inc. v. Natera, Inc.*, 2021 WL 1840646, at *3-4 (D. Del. May 7, 2021) (excluding similar Malackowski damages opinion involving "simple math calculations").

Most notably, Malackowski improperly relied on sources that have no connection to the facts of this case, including: █████████████

████████████████████████████████

██████████████████████████████████

███████████████████████████████

█████████████████████████████████

██████████████████████████████████

████████ 13-ER-3126. Malackowski made no attempt to consider how these sources █████████████████████████████ should apply to this case. That approach is irreconcilable with the "bottom line" of the Supreme Court's *Daubert* precedent: that an expert must "justif[y] the application of a general theory to the facts of the case." *Uniloc USA, Inc. v. Microsoft Corp.*, 632 F.3d 1292, 1316-1317 (Fed. Cir. 2011). In the comparable context of patent damages, for example, the Federal Circuit has long held that an expert may not

base his or her opinion on "an abstract and largely theoretical construct" that does not involve any "particular … industry[] or party"—even if that "abstract … construct" "is offered merely as a starting point." *Id.* at 1312, 1317 (rejecting as unreliable expert opinion based on "[t]he 25 percent rule of thumb … used to approximate [a] reasonable royalty rate"). That same principle should have barred Malackowksi from relying on such generic sources when seeking to justify a $50 million increase in compensatory damages.

Malackowski also improperly relied on passing statements made by Guardant's and Natera's CEOs. *See* 13-ER-3086-3087; *see also* 13-ER-3125-3126 (expert report). A self-serving statement by Guardant's co-CEO during his deposition that Guardant was ███████████████████████████ ████████████████████████████████████ 13-ER-3125-3126, cannot— without the underlying data—provide a reliable basis for an expert to provide an independent opinion on damages. Indeed, this was precisely the kind of boot-strapping analysis by Malackowski that was rejected by the *CareDX* court. FRE 702 does not permit an expert to "merely perform[] the multiplication [the plaintiff's CEO] outline[s] in his deposition testimony," as "[m]ultiplication is not a specialized form of knowledge that a jury lacks or a scientific technique that a jury is incapable of performing." *CareDX*, 2021 WL 1840646, at *3. The statement from Natera's CEO that Malackowski cited was shakier still, as it came

- 50 -

from a single informal email that (1) addressed how Natera *might* respond to Guardant's false/misleading statements and (2) said nothing about Natera's overall advertising spend responding to Guardant. 13-ER-3125 (quoting email as suggesting that Natera ███████████████████ ███ ).[10]

The court did not meaningfully grapple with the reliability of these sources of information. 13-ER-3086-3087. To the contrary, the court noted that "each piece of evidence" cited by Malackowski "arguably lends *weak* support for [the] multiplier" and that the opinion was based on "'[s]*haky*' … evidence." 13-ER-3087. Still, the court concluded that because Malackowski had the necessary credentials to provide opinions on "corrective advertising," disclosed the bases for his estimate, and did not root his opinion "'*solely*'" in multiplication based on Guardant's co-CEO's testimony, FRE 702 posed no obstacle. 13-ER-3086-3087; *see also* 1-ER-24-25 (district court's post-trial ruling stating, without elaboration, that *Daubert* ruling found the multiplier "'rational and supported'").

---

[10] ████████████████████████████████████
████████████████████████████████████████
13-ER-3125. But the amount of Natera's budget was already baked into Malackowski's base compensatory damages number of $24.8 million—it would be unreliable double-counting for Malackowski to rely on that number twice.

That reasoning was error for two separate reasons. *First*, as discussed above, an expert cannot permissibly rely on an abstract general theory or rule of thumb with no connection to the specific facts of the case (here, ████████ and generic expert testimony from another case) when calculating damages. *See supra* pp. 49-50.

*Second*, and regardless, the court failed to address whether Malackowski's proposed testimony met "the thresholds of relevance and reliability" before allowing the issue to go to the jury. *Engilis*, 151 F.4th at 1050. The court simply concluded that because Malackowski had provided sources for his position other than Guardant's co-CEO's testimony, it was up to the jury to weigh whether those sources reliably supported Guardant's damages position. *See* 13-ER-3087 ("Malackowski's multiplier is not *so unreliable* as to warrant exclusion under *Daubert*."). That reasoning—which suggests that Natera had the burden to prove Malackowski unreliable—ignored that this Court's caselaw put the burden on *Guardant* to establish its expert's reliability. The court's reasoning also had the effect of shifting the onus of evaluating the reliability (as opposed to the volume) of Malackowsi's underlying sources to the jury. But "[j]ust as the district court cannot abdicate its role as gatekeeper, so too must it avoid delegating that role to the jury." *Estate of Barabin v. AstenJohnson, Inc.*, 740 F.3d 457, 464 (9th Cir.

- 52 -

2014) (en banc), *overruled on other grounds by United States v. Bacon*, 979 F.3d 766 (9th Cir. 2020) (en banc).

### 2. Admitting Malackowski's Opinions On The 3X Multiplier Was Prejudicial

When, as here, an expert's opinion is improperly admitted, this Court "begin[s] with a presumption of prejudice," which can be rebutted by showing "it is more probable than not that the jury would have reached the same verdict even if the evidence had not been admitted." *Barabin*, 740 F.3d at 465. Guardant cannot meet that showing and, indeed, there would be no question that there was prejudice even if it were Natera's burden to prove it. Malackowski's testimony was the only evidence Guardant presented in support of its damages case; Guardant repeatedly emphasized that testimony in its closing statement, *see, e.g.*, 9-ER-2252-2253, 2255-2256, 2259; and the jury awarded almost exactly the sum Malackowski suggested, *see supra* p. 20. Without Malackowski's flawed testimony, Guardant would have lacked any basis for seeking compensatory damages at trial, much less applying the 3X multiplier to Natera's responsive advertising spend. *See, e.g.*, *Barabin*, 740 F.3d at 465 ("Prejudice is at its apex when the district court erroneously admits evidence that is critical to the proponent's case."). Under the circumstances—where the court considered and expressly adopted the (erroneous) rationale that Guardant offered for why Malackowski's testimony was reliable—

the only remedy that would serve the interests of justice is a new trial. *See Bacon*, 979 F.3d at 769-770.

> **B.      The District Court Erred By Permitting The Jury To Award $175.5 Million In Punitive Damages**
>
> > **1.      The Court Erred By Instructing The Jury That Punitive Damages Were Available**
> >
> > > ***a.      California Common Law Covers Only "Passing Off" Claims***

"[P]unitive damages are not available under the Lanham Act." *Duncan v. Stuetzle*, 76 F.3d 1480, 1490 (9th Cir. 1996); *see also* 15 U.S.C. § 1117(a). And although punitive damages *are* available under California common law in certain circumstances, the jury was never instructed on the metes and bounds of—nor asked to address whether Natera was liable under—California law. *See* 1-ER-98, 102-103 (instructions); 2-ER-201 (verdict form). Instead, the jury was instructed that it (1) "***must*** find" a party liable under California common law if it found that party "has violated the Lanham Act" because "California common law claims are substantially congruent to claims made under the Lanham Act," and (2) could "award punitive damages" if it found "a party liable for common law unfair competition." 1-ER-98, 102 (Instructions Nos. 39, 43). Those instructions misstated the law because California's common law tort of unfair competition is not "substantially congruent" with the Lanham Act. *See, e.g.*, 13-ER-3024; 1-ER-

- 54 -

119, 122 (Natera's objection). Accordingly, the jury had no legal basis to award punitive damages.

Specifically, the Lanham Act encompasses a broader range of conduct than California common law. In broad strokes, the Lanham Act imposes liability whenever a party makes a false or misleading statement in a commercial advertisement about its own or another's product, so long as that statement is material, made in interstate commerce, and the plaintiff is likely to be injured as a result. *Southland Sod Farms*, 108 F.3d at 1139. In contrast, the California Supreme Court has explained that California's common law tort of unfair competition is quite narrow—it "is generally thought to be synonymous with the act of 'passing off' one's goods as those of another." *Bank of the W. v. Superior Ct.*, 833 P.2d 545, 551 (Cal. 1992). Put differently, the common law targets situations where "a person exploits a competitor's reputation in the market"—for example, by using the competitor's "trade names and common law trademarks." *Id.* Both the California Court of Appeal and this Court have relied on the *Bank of the West* decision in explaining the common law tort's scope. *See Los Defensores, Inc. v. Gomez*, 223 Cal.App.4th 377, 393-394 (2014) (tort of unfair competition is "the act of 'passing off' one's goods as those of another"); *Southland Sod*, 108 F.3d at 1147 (dismissal of claim proper because "Plaintiffs' allegations do not amount to 'passing off' or its equivalent"); *Sybersound Recs., Inc. v. UAV Corp.*,

517 F.3d 1137, 1153 (9th Cir. 2008) (affirming dismissal of claim because plaintiff had not alleged defendants "have passed off their goods as those of another nor that they exploit trade names or trademarks"). Because "the task of federal court in a diversity action is to approximate state law as closely as possible," *U.S. Fidelity & Guarantee Co. v. Lee Invs., LLC*, 641 F.3d 1126, 1133-1134 (9th Cir. 2011), the court erred in instructing the jury that a violation of the Lanham Act is necessarily a violation of California common law.

The court went astray by relying on another line of caselaw from this Court, which includes this statement: "[S]tate common law claims of unfair competition … are substantially congruent to claims made under the Lanham Act." *E.g.*, 1-ER-14, 19 (quoting *Cleary v. News Corp.*, 30 F.3d 1255, 1262-1263 (9th Cir. 1994)). But *Cleary* does not govern here. ***First***, *Cleary* relied entirely on pre-*Bank of the West* federal decisions in interpreting the scope of California's common law. That prior caselaw was "only binding in the absence of any subsequent indication from the California Court's that [this Court's] interpretation was incorrect." *Munson v. Del Taco, Inc.*, 522 F.3d 997, 1002 (9th Cir. 2008). *Bank of the West* provides the necessary "subsequent indication." ***Second***, the passage from *Cleary* the court cited is dicta, because the claim at issue ***was*** a passing off claim, 30 F.3d at 1262-1263, and there was no need for *Cleary* to further consider the doctrine's metes-and-bounds. Put simply, *Cleary* merely summarized (federal) caselaw referencing

the "substantially congruent" standard "casually and without analysis." *United States v. Ingham*, 486 F.3d 1068, 1078 n.8 (9th Cir. 2007).[11]

### b.     The Instructional Error Was Not Harmless

Guardant cannot show it is more likely than not that the jury would have reached the same result with proper instructions. *See BladeRoom*, 20 F.4th at 1243. The only way the court's instruction regarding the scope of California law could be correct would be if Guardant had pursued a "passing off" claim. In the more than four years this case has been litigated, however, Guardant has never asserted Natera passed off Signatera as Guardant's product. Rather, Guardant's theory of Lanham Act liability is that Natera relied on comparative advertising to (purportedly) improperly suggest Signatera was superior to Reveal. *See supra* pp. 16-17; *see also* 9-ER-2250-2251 (closing) ("[D]octors got the message that Signatera is superior to Reveal. That's the message they took away."). Accordingly, allowing the jury to award punitive damages was legal error.

---

[11] The district court also remarked that Natera first raised this issue during "the final rounds of jury instructions," but notably failed to adopt Guardant's assertion that Natera had waived/forfeited (or was estopped from) from challenging the instruction. 1-ER-21 n.2, 1-ER-27 n.3. For good reason: Natera "objected to the jury instructions in a timely manner, and the Federal Rules require nothing more." *See Prime Finish, LLC v. ITW Deltar IPAC*, 766 F. App'x 183, 185 (6th Cir. 2019).

**2.      No Reasonable Jury Could Have Found Guardant Proved Natera Engaged In The Kind of Despicable Conduct That Warrants Punitive Damages**

Because there is no reasonable argument that Natera's advertisements were "passing off" claims, no reasonable jury could have found Natera liable under California law (and thus could not have awarded any punitive damages based on a violation of that law). Regardless, even if the court had applied the right legal standard, it erred for another reason. California law permits the recovery of punitive damages "for the sake of example and by way of punishing the defendant" only "[w]here the defendant's oppression, fraud or malice has been proven by clear and convincing evidence." *Simon v. San Paolo U.S. Holding Co.*, 113 P.3d 63, 78 (Cal. 2005) (quoting Civ. Code § 3294(a)). No reasonable jury could find by clear and convincing evidence that Natera engaged in the kind of despicable, bad faith conduct necessary to justify such an award. *See* 1-ER-102-103 (jury instructions) (punitive damages require either "despicable" behavior or intentional misrepresentation with intent to harm the plaintiff); *see also* 2-ER-194-195 (Natera's JMOL request on punitives). Indeed, the district court's post-trial ruling provided no explanation for why the $175.5 punitive damages award was supported by substantial evidence. *See* 1-ER-14-15.[12]

---

[12] This Court reviews "whether California law permits a jury's decision to award punitive damages for substantial evidence." *Hardeman v. Monsanto Co.*, 997 F.3d 941, 970 (9th Cir. 2021).

- 58 -

At trial, Guardant's primary argument was Natera had engaged in "fraud"—
*i.e.*, "intentionally misrepresent[ing] or conceal[ing] a material fact" with the
"inten[t] to harm the injured party." 1-ER-102; 9-ER-2258. But even taking
Guardant's allegations at face value, Natera merely compared the results of two
peer-reviewed studies without adequately disclosing slight differences in how the
studies were run. Guardant itself also compared the same two studies both
internally and in its submissions to MolDX without mentioning the slight
differences, *see supra* pp. 15-16, 34, and Guardant's own co-CEO conceded that
the Parikh Study was designed "to be in line with the Reinert study," 5-ER-992.
No reasonable jury could have found such a comparison was an ***intentional***
misrepresentation or concealment. While a handful of Natera emails used colorful
and even overly aggressive terms to describe the competition between Guardant
and Natera (for example, describing Natera having a "war room" or indicating
Natera intended to "salt" Reveal's launch, *e.g.*, 11-ER-2708-2710 (TX-150); 11-
ER-2691-2696 (TX-109); 11-ER-2711-2714 (TX-152), there is no evidence in the
record suggesting Natera acted in anything but good faith by distributing the
advertisements at issue in the Spring of 2021—or otherwise believed its
comparisons were misleading. To the contrary, Natera's employees testified that

the advertisements were intended "[t]o set the record straight" and show (in

Natera's view) "Signatera performance relative to what Guardant was showing in

their study." 4-ER-868 (Natera's Vice President of Oncology Marketing at the

time of the advertisements); *see also* 6-ER-1286 (Natera's CEO testifying Natera's

advertisements were intended to prevent "patients … and physicians" from being

"misled").

Guardant's counsel's only other line of argument was that Natera had

"play[ed] with the lives and health of other human beings," 9-ER-258—apparently

a (fallacious and highly prejudicial) argument that Natera's advertisements

discouraged doctors and patients from using Reveal. This argument, however, is

even weaker than the first: "Punitive damages may not be used to punish the liable

party for the harm to anyone other than the injured party in this case." 1-ER-103

(Instruction No. 43).

### 3. The Jury Could Not Have Awarded More Than $75 Million In Punitive Damages Without Violating Due Process

Additionally, due process "prohibits the imposition of grossly excessive or

arbitrary punishments." *State Farm Mut. Auto. Ins. Co. v. Campbell*, 538 U.S. 408,

416-417 (2003).[13] The "most important indicium of the reasonableness of a

punitive damages award is the degree of reprehensibility of the defendant's

---

[13] This Court "review[s] de novo, with an '[e]xacting appellate review,' the constitutionality of a punitive damages award." *Hardeman,* 997 F.3d at 970.

conduct," *id.* at 419, and the court rightly suggested Natera's conduct was not "particularly egregious," 1-ER-25. As the court indicated, for example, Natera's conduct was limited to "'economic damages'" rather than physical harm. 1-ER-25. More broadly, Natera's conduct did not evince an indifference to or reckless disregard of the health or safety of others, *Hardeman*, 997 F.3d at 972, as Natera disseminated its comparative advertisements to experienced oncologists precisely because it believed Guardant was not being truthful about the efficacy of Reveal, *see supra* pp. 13-14. Nor was Natera's purported "target" "financially vulnerable," *Hardeman*, 997 F.3d at 972; Guardant is a large, sophisticated business that was the "800-pound gorilla" of the oncology space, *see supra* p. 9. Natera's alleged conduct was closer to an "isolated incident" than "repeated actions," *Hardeman*, 997 F.3d at 972, as the allegations in this case centered on the distribution of a handful of documents in the Spring of 2021 that all contained essentially the same kind of side-by-side comparison, *see supra* pp. 13-15. And as discussed above in addressing substantial evidence, there is no record evidence showing Natera engaged in **intentional** malfeasance, *Hardeman* 997 F.3d at 973. Guardant cannot reasonably argue it was fraud for Natera to compare the results of the Reinert and Parikh Studies when Guardant did the same thing.

Given these facts, the court erred by concluding the jury's $175.5 million award was "well within the range of [the] appropriate ratio" of "4 to 1" of punitive

to compensatory damages. 1-ER-25; *compare* 2-ER-197-198 (Natera's Due Process argument). The court provided no explanation for its ruling, and the case it cited for its 4:1 ratio involved miniscule damages awards ranging from $582 to $3,133. *See Riley v. Volkswagen Grp. of Am., Inc.*, 51 F.4th 896, 900 n.2 (9th Cir. 2022). In cases like this one, where "compensatory damages are substantial, then a lesser ratio, perhaps only equal to compensatory damages, can reach the outermost limit of the due process guarantee." *State Farm*, 538 U.S. at 426. The jury's $75 million award for corrective advertising was "substantial" within any reasonable understanding of the word. *Hardeman*, 997 F.3d at 975 (finding $5.2 million award "substantial" and noting damages are "often … considered 'substantial' when they are over $1,000,000").[14]

## CONCLUSION

The district court's judgment should be reversed and the case remanded for the court to enter judgment in Natera's favor on Natera's (lack of) liability and punitive damages and to hold a new trial as to Guardant's liability. At a minimum, Natera is entitled to a new trial on its liability, Guardant's liability, and damages.

---

[14] *State Farm* contemplates a court can also consider the "civil penalties authorized and imposed in comparable cases," 538 U.S. at 428, but the district court did not address this factor—likely because neither party has identified a comparable punitive damages award imposed under California common law. This Court has concluded that $500,000 was the maximum award "consistent with due process" for a "passing off" claim under Oregon law. *See Leatherman Tool Grp., Inc. v. Cooper Indus., Inc.*, 285 F.3d 1146, 1150, 1152 (9th Cir. 2002).

- 63 -

Respectfully submitted,

/s/ Seth P. Waxman

THOMAS G. SPRANKLING
WILMER CUTLER PICKERING
   HALE AND DORR LLP
2600 El Camino Real Suite 400
Palo Alto, CA 94306
(650) 858-6000

SETH P. WAXMAN
JOHN HE
WILMER CUTLER PICKERING
   HALE AND DORR LLP
2100 Pennsylvania Ave NW
Washington DC, 20037
(202) 663-6000

MICHAEL J. SUMMERSGILL
ADELA LILOLLARI
WILMER CUTLER PICKERING
   HALE AND DORR LLP
60 State Street
Boston, MA 02109
(617) 526-6000

December 18, 2025

## UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT

### Form 8. Certificate of Compliance for Briefs

*Instructions for this form:* http://www.ca9.uscourts.gov/forms/form08instructions.pdf

**9th Cir. Case Number(s)** | 25-5503

I am the attorney or self-represented party.

**This brief contains** | 13,936 | **words, including** | 313 | words

manually counted in any visual images, and excluding the items exempted by FRAP

32(f). The brief's type size and typeface comply with FRAP 32(a)(5) and (6).

I certify that this brief *(select only one)*:

☉ complies with the word limit of Cir. R. 32-1.

○ is a **cross-appeal** brief and complies with the word limit of Cir. R. 28.1-1.

○ is an **amicus** brief and complies with the word limit of FRAP 29(a)(5), Cir. R.
29-2(c)(2), or Cir. R. 29-2(c)(3).

○ is for a **death penalty** case and complies with the word limit of Cir. R. 32-4.

○ complies with the longer length limit permitted by Cir. R. 32-2(b) because *(select only one)*:

☐ it is a joint brief submitted by separately represented parties.
☐ a party or parties are filing a single brief in response to multiple briefs.
☐ a party or parties are filing a single brief in response to a longer joint brief.

○ complies with the length limit designated by court order dated [            ].

○ is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).

**Signature** | s/ Seth P. Waxman | **Date** | December 18, 2025

*(use "s/[typed name]" to sign electronically-filed documents)*

Feedback or questions about this form? Email us at forms@ca9.uscourts.gov

**Form 8** | *Rev. 12/01/22*

## CERTIFICATE OF SERVICE

I hereby certify that on this 18th day of December, I caused to be electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit using the appellate CM/ECF system. Counsel for all parties to the case are registered CM/ECF users and will be served by the appellate CM/ECF system.

I also hereby certify that on this 18th day of December 2025, I caused the sealed version of this brief to be served on Counsel for Appellee via email with prior written consent for email service.

/s/ Seth P. Waxman
SETH P. WAXMAN